**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **ANNA BARNES,** | )( | **Civil Action No. 3:22-cv-161** |
| | )( | **(Jury Trial)** |
| *Plaintiff,* | )( | |
| | )( | |
| **V.** | )( | |
| | )( | |
| **CITY OF EL PASO, TEXAS;** | )( | |
| **GREGORY K. ALLEN,** *Individually;* | )( | |
| **OLIVER K. MEISE,** *Individually;* **and** | )( | |
| **JARRED R. FRANK,** *Individually,* | )( | |
| | )( | |
| *Defendants.* | )( | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF THE COURT:**

NOW COMES Plaintiff ANNA BARNES complaining of CITY OF EL PASO TEXAS; GREGORY K. ALLEN, *Individually;* OLIVER K. MEISE, *Individually;* and JARRED R. FRANK, *Individually,* requesting damages and injunctive relief and will show the Court the following:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal claims, under 28 U.S.C. § 1331, 42 U.S.C. §§ 1983 and 1988, and supplemental jurisdiction, under 28 U.S.C. § 1367(a), to hear Plaintiff's state law claims, if any. Venue is proper in this Court, under 28 U.S.C. § 1391(b) because the incident at issue took place in El

Paso County, Texas within the United States Western District of Texas.

## PARTIES

2.      Plaintiff ANNA BARNES is a resident of El Paso County, Texas.

3.      Defendant CITY OF EL PASO ("the City") is a municipality organized under the laws of the State of Texas and is on El Paso County.

4.      Defendant OLIVER K. MEISE is sued in his individual capacity and can be served with process at 911 N. Raynor Street, El Paso, Texas 79903 or wherever he is found.

5.      Defendant GREGORY K. ALLEN is sued in his individual capacity and can be served with process at 911 N. Raynor Street, El Paso, Texas 79903 or wherever he is found.

6.      Defendant JARRED R. FRANK is sued in his individual capacity and can be served with process at 911 N. Raynor Street, El Paso, Texas 79903 or wherever he is found.

## INTRODUCTIONARY FACTS

7.      Despite many excessive force deaths and injuries, many well-publicized, as well as a March 3, 2020 El Paso federal court ruling (**Exhibit 1**) that there is proof of a custom of failure to train a custom of failure to discipline for excessive force the City of El Paso has done nothing to curb excessive force. Indeed, the basics of the March 2020 ruling were confirmed in a subsequent excessive force

death case August 20, 2021 ruling (**Exhibit 2).**  While the federal court rulings specifically pointed to the failure of El Paso policymaker Police Chief Gregory K. Allen as allowing even the severest of excessive force to go unpunished or lightly punished, just as in the case at bar, there is not even a whisper by the City of El Paso to replace him even to this day seven hundred and ninety-three (793) days later. Additionally, the City of El Paso has failed to indemnify its police officers or provide insurance to cover damage claims for excessive force by its police officers thereby encouraging excessive force by greatly discouraging claims against officers even though the claims be wholly meritorious. It is well known Texas is debtor friendly state whereby collecting on a judgment against individuals without coverage is very remote.

8.    Furthermore, El Paso remains the largest city in Texas without police body worn cameras by conscious choice, the issue having been brought up many times by the El Paso City Council and Mayor.

9.    As El Paso completely ignored the federal rulings it is no wonder then that unarmed mother of five Anna Barnes, was savagely beaten, by El Paso police officer Jarred R. Frank,[1] breaking bones ("bilateral nasal bone fractures") in her face and striking her eyes, upper lip, and cheek, while another officer Oliver K. Meise

---

[1] Jarred R. Frank is named in an El Paso police internal affairs report as having violated policy in this incident.

assisted and looked on in silence. Anna even experienced "tachycardia" due the severe beating and pain. Yet, Franks was so sure he would not be punished he admits in a sworn affidavit that he *"struck the face of the [Anna Barnes] multiple times."* True to form and despite an El Paso internal affairs investigation Meise went wholly unpunished and Frank was given only an 8-hour suspension by Chief Allen in a discipline system shrouded in secrecy.

10.     To cover up the excessive force Meise and Frank claimed Anna was intoxicated yet an ER doctor stated Anna was *"not slurring her speech, answering all questions appropriately, **clinically sober** and was demonstrating capacity to make medical decisions."*

11.     Ms. Barnes even *agreed* to a blood test having been offered no breath test or Standard Field Sobriety test to prove her innocence. Texas Department of Public Safety examined Anna's blood and declared that Anna "passed" her blood test and her license would not be suspended.



12.

## ADDITIONAL FACTUAL BACKGROUND

13.    Anna Marie Barnes is 34 years old and the mother of five children, 4, 6, 8, 10, and 17. Anna works as an insurance broker full time since 2019.

14.    Anna has an associate's of applied sciences and degree work in business.

15.    Anna has never been convicted of a felony or a crime of moral turpitude

in her life.

16.     August 27, 2021 Anna and her five children went to Urban Air Venture Park an entertainment business for children in El Paso to celebrate her 8-year old daughter's Birthday.

17.     Anna and her children stayed for around three hours zip lining, jumping into piles of foam balls, and other activities. Nothing eventful happened at Urban Air.

18.     Around 10 pm Anna and the children left in their SUV. Everyone was secured in their seats as per Texas law. The vehicle had insurance, current registration and up to date inspection. The SUV is licensed to Anna and the address on the registration has Anna's correct current address.

19.     Anna had just left a stop light and was driving about 5 to 10 miles an hour when suddenly a gust of wind came through the driver's side window and blew a lit cigarette ash onto her right arm burning it.

20.     As Anna quickly brushed the lit ash from her arm she accidentally went over a low curb and hit a small sapling.

21.     The sapling only had a little bark rubbed off and was not damaged much. The airbag did not deploy due to the slow speed of the vehicle when it bumped the sapling. *See photos below.*





22.     No one was injured in the accident, even according to the El Paso police accident report.

23.     After bumping the sapling everybody got out of the vehicle and an acquaintance was called to pick up the children.

24.     El Paso police officers Meise and Frank pulled up on Anna and the children a few minutes after bumping the sapling. Neither Meise or Frank had body worn cameras as the City of El Paso did not issue any to them.

25.     The police asked if Anna was the driver of the vehicle and Anna said yes.

26.     El Paso EMS arrived and asked if anyone was injured and it was ascertained no one was injured by the accident. Officer Frank told Anna to go over to Officer Meise who was about twenty feet away.

27.     Meise then stated to Anna she was going to be arrested for DWI with children in the car under the age of fifteen, a felony. This was quite shocking as no

one had requested the Standard Field Sobriety Tests, Breath Alcohol Test, or Blood Alcohol Test, and Anna was not intoxicated. Anna would have gladly performed any test and passed.

28.     Anna started crying due to the stress of the situation and the sudden statement that arrest would occur without adequate explanation.

29.     Officer Frank then came over and used a leg sweep on Anna's legs and Anna hit the ground on her right hip. At the time of the leg sweep Anna was not resisting arrest or otherwise a danger but acting legally. After Anna hit the ground Officer Frank rolled Anna on her stomach and put on handcuffs. Then he pulled her up and sat her on the curb.

30.     Anna was still crying and this seemed to irritate Officer Frank and he hit Anna twice in the face while Anna was handcuffed. When the handcuffed Anna criticized the excessive force just inflicted upon her Officer Frank started repeatedly striking Anna in the face-over ten more times-as Anna tried to say more but the strength of the blows increased as she started to scream. During this time Meise was holding onto Anna's shoulder to assist Frank land the blows. The blows caused fractures in her face, contusions, and bruising. Neither Frank or Meise complained of any injury or assault to themselves as there was none. During the time to the force used on Anna Meise was with a foot or two and could not have missed any of the force used by Frank. Meise did not try to stop Frank from the use of force by either

words or action. Meise did not report Frank for any policy violation such as improper use of force.

31.     Anna's children could hear the handcuffed Anna screaming, terrifying them.

32.     Due to her injuries by Officer Frank El Paso EMS then put gauze on Anna's eyes and put her on a stretcher and took her to the emergency room. EMS or the police took a photo of Anna's severely injured face.

33.     Anna went to hospital where she was given a CT scan and MRI confirming the multiple nasal fractures and other injuries. The doctor stated Anna was "*not slurring her speech, answering all questions appropriately, **clinically sober** and was demonstrating capacity to make medical decisions*." The hospital determined that the <u>cause of Anna's injuries was assault</u>.

34.     Anna was then taken to the El Paso County jail by Meise and Frank despite Anna's expressed fear of further injury. At the jail she agreed to a blood test which eventually the Texas Department of Public Safety analyzed and determined that Anna passed her blood test and so notified the El Paso police and El Paso District Attorney Yvonne Rosales around December 21, 2021.

35.     Anna was charged with felony DWI with child under the age of fifteen and resisting arrest based upon the false statements of Officer Meise and Franks. Despite the overwhelming proof that Anna was not intoxicated by the ER doctor and

medical records, the Texas Department of Public Safety District blood test results, the failure of Meise and Frank to request or do Standard Field Sobriety Tests, and her severe beating injuries El Paso District Attorney Yvonne Rosales has not dismissed any of the charges despite media inquiries. *https://www.ktsm.com/local/el-paso-news/update-attorney-of-woman-who-claimed-she-was-beaten-by-eppd-calls-for-her-dwi-to-be-dropped/* Furthermore, the District Attorney's office is not prosecuting Meise or Franks despite the proof of Anna's severe injuries while handcuffed, medical records, and affidavit admission of Frank.

36.     DA Rosales has not convicted one El Paso police officer for excessive force during her tenure despite even the two federal court cases (**Exhibits 1 and 2**) resulting in the death of El Paso citizens. Manslaughter and murder have no statute of limitations. The DA's office is not a deterrent for excessive force, instead it appears to encourage it by allowing false DWI charges to propagate against victims despite no probable cause a crime has occurred.

37.     Only after many rejections of the body worn camera when brought up to Allen, the Mayor and City Council, in 2017 and earlier, the El Paso Mayor and City Council did, in March 2022, pass a measure for body worn cameras but still only *starting* deployment sometime earliest in the Summer of 2023. The timetable of deployment remains unknown. See: *https://elpasoheraldpost.com/el-paso-city-council-unanimously-approves-6-6-million-in-funding-for-700-body-worn-*

11

*cameras-for-el-paso-police-department/*

38.     Anna needs expensive facial reconstruction surgery due to the injuries inflicted by Frank and Meise. **Exhibit 3.** Anna has suffered great anxiety, fear, depression, and other mental anguish. The pain has been immense and lingers to this day. The necessary surgery will cause more pain.

39.     On April 29, 2015 Erik Salas-Sanchez was 22 years old and lived with his family at 376 Jesuit Drive in El Paso, Texas.  Erik was five foot seven inches and weighed only 117 pounds. El Paso Police officers Gomez and Rivera acting in concert tased and then shot and killed unarmed Erik. At the time of the tasing and killing Erik was not a threat. The shooting of Erik was litigated and **Exhibit 4** is the Court's ruling denying Gomez and Rivera's motion for summary judgement on excessive force.

## II. THE EL PASO POLICE DEPARTMENT'S CUSTOM, POLICY, AND/OR PRACTICE OF USING EXCESSIVE FORCE.

40.     The policies, practices, and/or customs of the EPPD constituted moving forces of the unconstitutional conduct that proximately caused Anna's injuries. EPPD fails to discipline officers who use excessive deadly or other excessive force against El Pasoans in general.  EPPD fails to properly train officers in use of force. All of these policies were the moving force of the constitutional violations that resulted in Anna's injuries.

41.     The EPPD also has a persistent and widespread practice of officers using excessive deadly, intermediate force, or other excessive force against El Pasoans. These practices are so widespread that they constitute a custom that fairly represents municipal policy and are so obvious that they demonstrate the EPPD policymaker's deliberate indifference toward El Pasoans' constitutional rights.

42.     The policymaker responsible for all policies, practice, or customs listed below is Police Chief Gregory Allen.  Chief Allen is a decision-maker who possesses final authority to establish municipal policy with respect to the actions of the EPPD. EPPD policy and City law designate him as the final authority on all matters of policy, operations, and discipline of the EPPD.

A.     EPPD'S FAILURE TO DISCIPLINE OFFICERS FOR USE OF EXCESSIVE FORCE.

43.     First, the City has a policy of failure to discipline or investigate cases involving excessive deadly force.  Discipline of all officers for any citizen complaint is the decision of the policymaker, Chief Gregory Allen.  He makes these decisions with the recommendation of a Disciplinary Review Board (DRB).

44.     The DRB takes action by a majority vote on whether or not to find that an officer's actions are outside policy and the sanction to apply.

45.     All decisions by the DRB are subject to the discretion of Chief Allen who may reverse or mitigate discipline as he sees fit.

46.     The DRB is comprised of officers and a few civilians.  At times over the last ten years, the DRB has had no civilian members at all.  At most, the DRB had two to three civilian members – which was nowhere near close to enough to sway the Board's decisions.  The makeup of the DRB ensures that officers will always comprise a majority of its members creating a built in bias in favor of the officers.

47.     This make-up and Chief Allen's overriding authority has resulted in an atmosphere in which officers accused of excessive force almost uniformly do not face sanctions.  Upon information and belief, of the cases brought to the DRB from 2012 to 2016, less than 10% of those cases resulted in any action by the DRB against the officer.  Of that 10%, nearly every officer in question only received counseling, including those found to have engaged in excessive force, as a consequence for their actions – which does not go on their disciplinary review card.

48.     Chief Allen also regularly mitigates discipline against officers engaged in the excessive use of force contrary to the recommendation of the DRBs.

49.     Chief Allen has continued to implement a DRB where membership consistently comprises a majority of law enforcement officers knowing that this composition leads to less accountability for officers engaged in the excessive use of force.  A DRB with a majority of civilian members not on EPPD payroll would

ensure the independence of the DRB and reduce impunity for officers involved in excessive force incidents.

50.    By maintaining a DRB that lacks independence, EPPD's disciplinary policy allows officers to use excessive force and to specifically use excessive intermediate and deadly force where officers are on notice of a victim's mental illness without suffering any disciplinary action.  The DRB stands in stark contrast to other well-known models where there is more independent and meaningful oversight of police conduct because the review boards do not include members who work for law enforcement agencies, such as the Independent Police Oversight Board in Houston.

51.    Chief Allen's failure to properly discipline officers engaged in excessive use of force is obvious and has caused the disproportionately high incidents of excessive use of force and excessive use of intermediate and deadly force.  Chief Allen persisted in his failure to discipline his officers for excessive use of force and excessive use of intermediate and deadly force, in knowing disregard that such a failure presents an obvious risk that constitutional violations will occur. For these specific reasons, this failure to discipline was the moving force that caused the constitutional violation at issue.

52.     In the case of Erik's death referenced above, despite scathing dissent from civilian members of the DRB, the officers moved to not punish Mando Kenneth Gomez.  Smith and Rivera were never subject to the DRB.

53.     Second, the Department has a policy of finding all homicides by EPPD as "Justified." Of the shooting deaths reported by the EPPD to the Texas Attorney General between 2012 and 2016[2], the Department classified all but one as a "Justified Homicide" with one classified as "Other Homicide."  None of the shootings, including those involving unarmed victims, were classified as "Unjustified Homicide."  Decisions to consider EPPD shooting deaths as "Justified" or "Unjustified" are made solely by Chief Allen.  Decisions to discipline, or not discipline, all officers are also made solely by Chief Allen.

54.     When the EPPD refuses to classify any officer-involved shootings as an "Unjustified Homicide," the Department fails to hold officers accountable for discharging their firearms – thereby creating a culture where officers use excessive deadly force with impunity. This policy and custom inflicts injury just as in the severe assault upon Anna Barnes.

55.     Chief Allen's failure to discipline officers as described above, and to classify shooting deaths as "Justified," are moving forces behind the constitutional violations that led to the severe assault upon Anna Barnes.

_____

[2] Data to be updated.

<u>USE OF DEADLY AND OTHER EXCESSIVE FORCE</u>

56.    The above-mentioned policies have created a persistent and widespread practice of officers using excessive deadly or intermediate force. EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

57.    In the fifteen years prior to 2012, there had been at least thirty-two incidents reported in which El Paso police officers used excessive deadly force.

58.    Since that time, the number has jumped.  From 2012 to 2016, based on a limited data set that does not include all instances, EPPD officers utilized excessive deadly or intermediate force at least twenty-one times – fourteen of which resulted in deaths.

59.    These rates are consistently higher than national rates.

60.    In 2015 alone, the per-capita rate of residents who died after being shot by EPPD officers was 90% higher than the national rate.[3]

61.    From 2012 to 2016, 50% percent of total deaths in EPPD custody involved unarmed victims.

62.    The percentage of residents shot and killed by EPPD officers involving unarmed victims in 2015 was 50% higher than the national percentage for the same

---

[3] No reliable comparative national rate exists prior to 2015.  The federal government has failed to maintain an accurate collective database of people killed by law enforcement at the national level.

year.  In 2016, the percentage of residents shot by EPPD officers involving unarmed victims was over 250% higher than the national rate.

63.     Chief Allen has had direct knowledge of these statistically high rates of the use of excessive deadly force and has acted with deliberate indifference to the consequences of these customs.

## EXAMPLES OF USE OF EXCESSIVE DEADLY OR INTERMEDIATE FORCE

64.     On March 8, 2013, officers arrested Daniel Rodrigo Saenz after receiving reports that he was acting strangely and threatening people.  Officers were aware when called out that he had been at a mental health facility.  After his arrest, in police custody, outside the local jail, unarmed, and while handcuffed behind his back, officers started dragging Saenz on the ground to take him to a medical facility for treatment of injuries.  As they dragged him, he started to resist.  An officer pulled out his gun and shot Mr. Saenz who died shortly thereafter as a result of the gunshot wounds.

65.     In this case, upon information and belief, the City's DRB considered the facts and recommended termination of the officer involved.   Nonetheless, Chief Allen kept the officer on payroll until he was reinstated by an independent arbitrator – despite the arbitrator's finding that the officer violated use-of-force policies.

66.     In October of 2013, police responded to a call that person was screaming outside a motel and was suffering from a mental health crisis.  When they

arrived, they found Fernando Gomez, also known as Mercedes Demarco, unarmed outside the motel and screaming for help.  The officers immediately tasered Ms. Demarco who allegedly died in the squad car shortly thereafter.

67.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

68.     On May 21, 2015, officers received a 911 call reporting that a man was very distraught, crying, and threatening to kill himself – in the throes of a mental health crisis.  Officers arrived and saw that David Alejandro Gandara did not have a weapon.  They immediately yelled at him to stop.  When he continued walking, the officers fired six shots at him, killing him on the scene.

69.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

70.     On June 23, 2015, officers received a 911 call from Daniel Ramirez's parents concerned that he was exhibiting suicidal tendencies.  The EPPD had prior knowledge of Ramirez's mental health issues.  Numerous officers arrived at the house and entered the backyard.  Upon entry into the backyard, they found Ramirez, unarmed, attempting to hang himself from a basketball net.  Rather than pulling him

down from the noose, the officers immediately tased him.  Mr. Ramirez died shortly

thereafter.

71.    Upon information and belief, the EPPD failed to even bring this

incident to the attention of the DRB and did not take any disciplinary action against

the officers involved.

72.    On April 16, 2016, El Paso Police Officers received a telephone call

from a distressed Eric Wilson.  Wilson had a rapport with the EPPD from previous

calls related to his mental health.  They were aware he was suffering from a mental

illness.  Nonetheless, five police officers arrived at his home to find him walking

back and forth in front of his residence.  The officers ordered Wilson to show his

hands.  According to reports, Wilson held up a cell phone in his hand in flashlight

mode.  The officers shot several rounds at him which caused his death after another

eight excruciating hours.

73.    Upon information and belief, the officer(s) involved in this incident

were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers

involved.

74.    On May 9, 2016, Arthur Williams' mother called the police and the

police had notice of his mental health issues.  Officers arrived and spoke with his

mother, who was outside the house.  Williams' mother asked him to leave the house

and speak with the officers.  Williams exited the house holding a toy BB gun and was immediately shot multiple times by several officers.

75.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

76.     Several other events involving the use of intermediate force in 2015 and 2016 that did not result in death also show a custom and practice of officers escalating the use of force when confronted with situations involving victims with disabilities.  For example, Jose Angel Acevedo alleged excessive use of force involving his arrest on August 11, 2015. According to his report, Acevedo's wife called 911 so that emergency responders could take him to the hospital because he was in emotional distress. The responding officers entered Acevedo's residence without permission, probable cause, or exigent circumstances.   The officers allegedly beat Acevedo, threw him to the ground, and held him in a choke hold while he repeatedly told them that he was unable to breath. The officers also allegedly tased him several times.

77.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

78.     On December 6, 2015, Javier Ortega suffered a seizure while driving and crashed his vehicle into a rock wall.  Mr. Ortega was unarmed.  Allegedly, responding officers -- rather than treating him -- allegedly tased him multiple times and beat him with a police baton.  Upon information and belief, after review of the case, Chief Allen refused to terminate or suspend the officers involved.

79.     On November 5, 2016, officers received a call reporting a possible suicide in progress.  When the officers arrived, Francisco Ramirez was allegedly holding a knife.  Rather than de-escalating the situation, officers immediately drew their weapons and shot Mr. Ramirez - who was injured but not killed from the attack.

80.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

81.     Each of these incidences shows a pattern of the police, when called to help with or on notice of a victim's mental health issues, to use excessive force to subdue the victim rather than utilizing alternative means to de-escalate the situation.  This pattern of constitutional violations puts EPPD on notice that the failure to implement proper procedures with respect to persons with mental health issues directly causes the use of excessive force and excessive intermediate and deadly force when officers are dealing with persons with mental health issues.

82.     Chief Allen acts with deliberate indifference to these consequences and for this reason, the policy is a moving force in the constitutional violations against Anna.

F.  <u>USE OF EXCESSIVE FORCE IN GENERAL</u>

83.     A limited review of citizen complaints between 2014 and 2016 show a high rate of excessive force complaints reported by citizens against officers.  EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

84.     Public data regarding Citizen Complaints is often hard to get and in other cases the City has obfuscated efforts to obtain this information publicly. Plaintiff will need the power of the Court to get these records.

85.     Nonetheless, based on the limited data provided, it is possible to identify a trend of comparatively high reports of excessive force among the El Paso Police Department.  Of the data provided, at least 20-27% of the Citizen Complaints involved officers' excessive force.  If this same percentage is applied to the reported 1,296 citizen complaints in 2014, it is reasonable to assume that between 259-349 complaints of excessive force were reported by officers in that year.  This number is high considering the size of the El Paso Police Department -- approximately 1,000 officers -- as it correlates to a rate of 25.9 to 34.9 citizen complaints of excessive force per officer.  The national average for such complaints is only 6.6 complaints

per officer.  Chief Allen's failure to discipline the officers involved, train them or otherwise remedy the problem is the moving force in the constitutional violations that took place against Erik.

## CLAIMS FOR RELIEF

## EXCESSIVE FORCE

86.    Defendants Frank and Meise, acting under color of state law, deprived Anna of her rights under the Fourth and Fourteenth Amendments to the United States Constitution by intentionally using an objectively unreasonable and excessive amount of force.

87.    These acts deprived Anna of her clearly established and well-settled constitutional rights under the Fourth and Fourteenth amendments and in violation of 42 U.S.C. §1983.  This violation proximately caused Anna's injuries for which all Defendants are liable.

## MONELL

88.    On information and belief, Defendant City of El Paso -- through the decisions of its policymakers Police Chief Gregory Allen, Mayor, and City Council – was directly responsible for the aforementioned misconduct, which proximately caused the damage to Plaintiff, by:

a.    maintaining a policy or custom of excessive force by officers that is so common and widespread as to constitute a custom that fairly represents municipal policy;

b.    maintaining a policy or custom of officers' failure to avoid the use of deadly or other excessive force against individuals when the officer is not at risk of imminent serious bodily injury or death; failing to properly train or supervise members of the El Paso Police Department, including Defendants Meise and Frank, not to use such force and what force to use;

c.    using intermediate, deadly force, or other excessive force against an individual who does not place the officer or another at risk of imminent serious bodily injury or death;

d.    failing to classify any officer-involved shootings as unjustified – particularly those involving unarmed victims;

e.    failing to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Meise, Frank, Gomez, Rivera, and Smith, who have deprived citizens and residents of El Paso of their constitutional rights;

f.    failing to implement body worn cameras; and

g.    failing to provide any means for a person to collect monetarily on any claim of excessive force by an individual police officer;

89.     The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were adopted with deliberate indifference to the constitutional rights of citizens.

90.     The aforementioned customs, policies, practices, and procedures, the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were a moving force and/or a proximate cause of the deprivations of Erik's clearly established and well settled constitutional rights under the Fourth amendment in violation of 42 U.S.C. §1983.

## LIABILTY FOR FAILURE TO INTERVENE

91.     A law enforcement officer "who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). Although *Hale* most often applies in the context of excessive force claims, this Court recognized that other constitutional violations also may support a theory of bystander liability. *Whitley v. Hanna*, 726 F.3d 631, 646 n. 11 (5th Cir. 2013)(citing *Richie v. Wharton County Sheriff's Dep't Star Team*, No. 12–20014, 2013 WL 616962, at *2 (5th Cir. Feb. 19, 2013)(per curiam) (unpublished)(noting

that plaintiff failed to allege facts suggesting that officers "were liable under a theory of bystander liability for failing to prevent ... other member[s] from committing constitutional violations")). Further, the Second Circuit has stated that "law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994). *See* also, *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)("we believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge."). Thus, officers such as Meise and Frank may be liable under § 1983 under a theory of bystander liability when the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley*, 726 F.3d at 646.

## STATE LAW ASSAULT AGAINST MEISE and FRANK (NOT TEXAS TORT CLAIMS ACT)

92.     Plaintiff brings a claim of assault against Meise and Frank, both individually, only. Meise and Frank did not act in good faith. Plaintiff does NOT bring an assault claim against the City of El Paso, Texas.

93.     The elements of assault are the same in civil and criminal suits. *Hall v.*

*Sonic Drive-In of Angleton, Inc.,* 177 S.W.3d 636, 649 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Morgan v. City of Alvin,* 175 S.W.3d 408, 418 (Tex. App.— Houston [1st Dist.] 2004, no pet.). A person commits an assault if the person (1) intentionally, knowingly or recklessly causes bodily injury to another, including the person's spouse;

(2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. Tex. Penal Code Ann. § 22.01(a) (Vernon Supp. 2010). The common law tort of assault exists to redress personal injury caused by offensive physical contact or the threat of imminent bodily injury. See *Hall v. Sonic Drive-In of Angleton, Inc.,* 177 S.W.3d 636, 650 (Tex.App.-Houston [1st Dist.] 2005, pet. denied).

## **COMPENSATORY DAMAGES**

94.    Because of Defendants' actions, Plaintiff is entitled to compensatory damages for their past and future pecuniary loss, past and future loss of companionship and society, past and future mental anguish, and all other compensatory damages to which they may be entitled.

## EXEMPLARY DAMAGES

95.     The severe excessive force used upon Anna and the failure to intervene by Meise and Frank, as well as the repeated past failure to discipline and train regarding excessive force by Allen, was willful, deliberate, malicious, and with reckless disregard of the rights of Anna entitling her to punitive damages.

## ATTORNEY FEES

96.     Plaintiff is entitled to recover his attorney fees and costs necessary to enforce his rights pursuant to 42 U.S.C. § 1988.

## JURY TRIAL

97.     Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

A.      Award Plaintiff compensatory damages for the acts described above of at least $50,000.000;

B.      Award Plaintiff punitive damages against the individually named Defendants of at least $50,000,000;

C.      Enter a finding that Plaintiff is the prevailing party in this case and award attorney fees, litigation costs and expenses plus pre-trial and posttrial interest against Defendants pursuant to 42 U.S.C. § 1988;

D.      Order training of police officers in the proper use of force by the City of El Paso and Allen;

E.   Order body worn cameras for all El Paso police officers and effective policies in their implementation;

F.   Order the City to indemnify or provide insurance to officers to cover damages caused by excessive force: and

G.   Grant such other and further relief in law or in equity to which Plaintiff may be entitled.

Respectfully Submitted,

/s/ *Randall L. Kallinen*
Kallinen Law PLLC
State Bar of Texas No. 00790995
511 Broadway Street
Houston, Texas 77012
Telephone:   713/320-3785
FAX:            713/893-6737
Email:          AttorneyKallinen@aol.com

Alexander C. Johnson
KALLINEN LAW PLLC
State Bar of Texas No. 24123583
511 Broadway Street
Houston, Texas 77012
Telephone:   573/340-3316
FAX:            713/893-6737
Email:          alex@acj.legal

ATTORNEYS FOR PLAINTIFF